**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **Crim. No. 22-cr-289** |
| | : | |
| **LOGAN CARR,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION**
**FOR REVOCATION OF DETENTION ORDER**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the defendant's Motion for Revocation of Detention Order and Request for Expedited Hearing (ECF No. 17).   The government requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at any hearing be considered in the Court's determination regarding pre-trial detention.

Based on the nature and circumstances of the offense, the strength of the evidence, the defendant's history and characteristics, and the danger to the community, the government respectfully requests that the Court deny the defendant's motion and continue to hold the defendant without bond pending trial to ensure the safety of the community, as he cannot overcome the rebuttable presumption in favor of detention.   In light of recent incidents, the government and DOC have taken steps to ensure the defendant's safety, and these incidents ultimately do not alter the Section 3142(g) factors governing the defendant's pretrial detention.

## FACTUAL AND PROCEDURAL BACKGROUND

The defendant has demonstrated time and again his noncompliance with pretrial release conditions. Magistrate Judge Harvey, at the preliminary detention hearing in which he detained the defendant, noted that this demonstrated history of noncompliance gave him "no confidence" that the defendant would be able to abide by the terms of any release. The factors underlying Magistrate Judge Harvey's decision have not changed, and this Court should uphold Magistrate Harvey's decision to hold the defendant.

### I.      April 13, 2021, No-Papered Arrest for Robbery

On April 13, 2021, the defendant was arrested by the Metropolitan Police Department ("MPD") for robbery. The facts of that arrest indicate that the defendant was stopped because he matched the lookout for a robbery suspect, and a subsequent pat-down revealed that the defendant had a 9mm firearm in his waistband. While a subsequent "show up" with the victim of the offense was negative, and the charge was ultimately no-papered, it is clear that the defendant unlawfully possessed a firearm in April 2021 as he did not have a license to possess that firearm.

### II.     July 6, 2021, Arrest for Firearm and Drug Charges (2021 CF2 003768)

Just a few months later, on July 6, 2021, MPD officers, responding to an anonymous tip of persons selling drugs, observed three males—one of whom was the defendant—sitting on the front steps of 1436 R Street, NW, with a clear plastic bag of what appeared to be marijuana. When an MPD officer approached the defendant, the officer observed the defendant shove something into his pants and also observed a bulge in the shape of a firearm protruding from the waistband of the defendant's pants. An officer informed the defendant that he was not free to leave, but the defendant attempted to leave. When MPD detained the defendant, officers recovered a Glock 44

.22-caliber firearm from the waistband of his pants.   The Glock 44 recovered from the defendant had one round in the chamber and eight rounds in the magazine.   The firearm was not registered to the defendant, and he did not possess a license to carry a firearm.   In the search incident to arrest, MPD officers recovered the following property from the defendant 's pockets:

- Two clear plastic bags containing a green leafy substance, which field-tested positive for THC;

- One black scale;

- Eleven empty small clear plastic bags; and

- $554.00 in U.S. currency.

The next day, the defendant was charged by complaint in D.C. Superior Court with one count of Carrying a Pistol without a License, in violation of 22 D.C. Code § 4504(a) (case number 2021 CF2 003768).   The government sought detention, but the court released the defendant *under the explicit condition that he may not possess any firearms*.   *See* Ex. 1.

On June 9, 2022, the government filed a five-count indictment against the defendant in D.C. Superior Court stemming from the July 6, 2021, incident, charging him with Unlawful Possession with Intent to Distribute a Controlled Substance While Armed; Possession of a Firearm During Crime of Violence or Dangerous Offense; Carrying a Pistol Without a License (Outside Home or Place of Business); Possession of Unregistered Firearm; and Unlawful Possession of Ammunition.   The defendant was arraigned on this indictment on July 25, 2022.   The first two counts carry a five-year mandatory minimum sentence, and the first three counts carry a presumption in favor of detention under D.C. law.   *See* 23 D.C. Code § 1322(c)(1), (c)(7).

**III.    July 7, 2021, Search Warrant at Prior Residence**

On July 7, 2021, MPD officers executed a D.C. Superior Court search warrant on the defendant's then-residence at his parent's home.   The defendant was not present at the time of the search.   Officers primarily searched the defendant's bedroom and uncovered an amount of what appeared to be marijuana but did not seize it or any other items.

**IV.    September 29, 2021, Search Warrant at Current Residence**

On September 14, 2021, a video appeared on YouTube featuring the defendant and Subject 1 with what appeared to be a gun and marijuana.   Throughout the video, the defendant can be seen holding cash and bags of what appears to be marijuana, while Subject 1 holds what appears to be a firearm.   Parts of the video appear to have been filmed inside of the defendant's studio apartment ("Current Residence"), which he had moved into after the search of his parents' residence.   Other parts of the music video depict several outdoor locations that are walking distance from the apartment, including an elementary school across the street.   Law enforcement learned that the defendant signed the lease for the Current Residence with his mother and confirmed that the defendant lives in that location.



*Still from a YouTube video of the defendant holding a bag containing what appears to be marijuana while Subject 1 holds what appears to be U.S. currency and a firearm.*



*Still from a YouTube video of the defendant and Subject 1 with the rear of the elementary school visible in the background.*

Law enforcement sought and received a D.C. Superior Court search warrant for the defendant's apartment.   On September 29, 2021, law enforcement observed the defendant, Subject 1, and Subject 2 enter the apartment building for the defendant's Current Residence. Subject 1 was wearing a red backpack at the time.   Shortly thereafter, MPD executed the warrant

at the Current Residence.   The defendant and Subject 2 were present in the apartment, and officers recovered three firearms, drugs, and drug distribution paraphernalia.   Specifically, officers recovered:

- A 9mm Glock 43, wedged above the light over the kitchen sink.   Officers also found a full six-round capacity magazine with six rounds and a single 9mm round.



*Glock 43 recovered from the defendant's kitchen.*



*Glock 43 recovered from the defendant's kitchen.*

- A 9mm Glock 17 in the bathroom, from which the defendant and Subject 2 emerged upon officers' entry.



*Glock 17 recovered from the defendant's bathroom vanity.*

7

- A .45 auto Ruger SR45 from a red backpack that was in the living area. That backpack was consistent with what Subject 1 was seen wearing upon entry into the building.

 

*Ruger SR45 recovered from the defendant's living room.*

- Approximately 15 ounces of green leafy substance, which tested positive for the presence of THC.   The marijuana was recovered from the defendant's pockets and the coffee table, and a large amount was found stuffed in a trash bag in a pillowcase in the closet.



*Marijuana recovered from the defendant's closet.*

- Approximately 8.5 grams of a white rock-like substance, which field tested positive for cocaine base.   The cocaine base was recovered from the coffee table as well as from a shoebox that the defendant told officers about.



*Cocaine base and U.S. currency found in the shoebox in the defendant's apartment.*

- Various indicia of distribution, such as two digital scales (one found on the coffee table and another removed from Mr. Carr's pocket), and a large amount of U.S. currency (including from the above-mentioned shoebox).

DNA swabs were obtained from Mr. Carr, Subject 2, and Subject 1.   The results for the Glock 43 recovered from the kitchen area were interpreted as being from three individuals.   The

results were 4.6 sextillion times more likely if the defendant was a DNA contributor to that gun; there was limited support for excluding Subject 2's DNA, and Subject 1 was excluded.   There was limited support for excluding the defendant's DNA from the Glock 17.   There was limited support for excluding his DNA from the Ruger or he was excluded (depending on the swab). Simply put, DNA strongly connects the defendant to the firearm seized from his kitchen, and two other firearms were located inside the defendant's apartment.

Both during and after the search, the defendant repeatedly stated that the apartment was his, and at one point when officers were counting the amount of cash present on the coffee table, the defendant stated that he had more money than that in his shoebox.   Officers searched the shoebox and recovered approximately $1,000 in U.S. currency, as well as suspected crack cocaine, as indicated above.

On August 30, 2022, an indictment was returned in the instant case stemming from the September 29, 2021, search of the Current Residence.   The defendant was charged with one count of Unlawful Possession With Intent to Distribute Cocaine Base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); one count of Unlawful Possession With Intent to Distribute Marijuana, in violation 21 U.S.C. § 841(a)(1) and (b)(1)(D); and one count of Using, Carrying, and Possessing a Firearm During and in Relation to a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

## V.   September 29, 2022, Search Warrant at Current Residence

On September 1, 2022, federal law enforcement executed the arrest warrant for the defendant following his indictment in the instant case.   Agents knocked and announced on the door of his Current Residence, the same studio apartment previously searched on September 29,

2021.   Officers observed the defendant, clothed in a tank top and boxer shorts, standing near an open window.   The defendant requested that agents obtain pants, shoes, and a sweatshirt from his apartment.   To do so, agents conducted a protective sweep of the apartment to find the items the defendant requested.

In the course of this protective sweep, agents saw, in plain view, items consistent with narcotics trafficking, including a small digital scale; a small plate and a razor blade; a box of sandwich-sized plastic zip bags; a Pepsi bottle split in two with a false bottom; a large clear bag containing a green leafy substance consistent with the appearance of marijuana; a clear plastic bag containing approximately ten small zips of a white rock-like substance consistent with the appearance of cocaine base; and two cellphones (one smartphone and one flip phone).

Law enforcement then applied for and received a search warrant for the Current Residence. After receiving the search warrant, law enforcement recovered the following items from there:

- Ten small clear zip bags containing approximately 1.6 grams of a white rock-like substance that field-tested positive for crack cocaine;

- A bag with approximately 14.5 grams of a white powder consistent with the appearance of cocaine, and which DEA testing later revealed to be approximately 12.2 grams of fentanyl;

- A Glock 9mm magazine with a 15-round capacity loaded with four rounds;

- An unloaded pro mag extended magazine;

- A bag containing white Nike men's shoes, a wet black hoodie, a wet black ski mask, two blue latex gloves, and a black Glock 9mm 33-round capacity magazine fully loaded; and

- $1,367.00 of U.S. currency.

Separately, in the grass alleyway beneath the open window by which agents observed the defendant standing, agents recovered a Glock 19 9mm handgun with one round in the chamber and a fully loaded 17-round magazine; a bag containing approximately 12 grams of an off-white rock-like substance that field-tested positive for crack cocaine, and a clear knotted plastic bag containing approximately 7.2 grams of a white powder that field tested positive for cocaine.   The defendant was alone in the apartment when agents executed the arrest warrant.   Furthermore, agents reviewed surveillance footage from the defendant's apartment building, and in one camera recording, a small object can be seen falling from the vicinity of the open window at the approximate time that agents knocked and announced on the defendant's apartment door.   Thus, it appears that Mr. Carr threw a loaded firearm and narcotics out of his apartment window in an attempt to keep law enforcement from recovering these items.

Upon arrest, the defendant was transported to the Washington Field Office of the FBI. While in custody, at or around 7:30 a.m., the defendant requested to use the restroom and was taken to a restroom.   At approximately 10:30 a.m., an Assistant U.S. Attorney ("AUSA") (who was not the undersigned), who was at the FBI field office for another matter, used the same restroom.   An FBI agent entered the restroom immediately after the AUSA's exit and observed a zip lock bag containing several additional knotted zip lock bags floating in the toilet.   The zip lock bags appeared to contain narcotics.   The AUSA did not observe the zip lock bags while using the toilet.   Law enforcement agents are not aware of anyone using the witness interview room restroom after the defendant and before the AUSA.   As such, it appears that the defendant attempted to flush additional narcotics in his possession down the toilet.

**VI.**     **Mr. Carr's Initial Appearance and Detention Hearing**

The defendant had his initial appearance on September 6, 2022, before the Honorable Zia M. Faruqi.   The government moved for detention pursuant to 18 U.S.C. § 3142(f)(1)(C) (serious drug felony) and 18 U.S.C. § 3142(f)(1)(E) (offense involving a firearm), which was granted.

The defendant's detention hearing was on September 12, 2022, before the Honorable G. Michael Harvey.   The defendant's parents were in attendance and were offered as third-party custodians for the defendant's release to home confinement.   Magistrate Judge Harvey also heard testimony from the defendant's father regarding his potential custodianship.   However, Magistrate Judge Harvey noted his grave concerns regarding the defendant's ability to comply with pretrial release conditions.   Specifically, Magistrate Judge Harvey stated that he had "no confidence," in the defendant's ability to comply with pretrial release conditions given that the defendant was already on pretrial release for his Superior Court case when he allegedly committed the conduct underlying the instant federal offense.   Moreover, Magistrate Judge Harvey noted that when federal agents executed the arrest warrant in this case, they again found drugs, drug distribution paraphernalia, and at least one firearm.

## LEGAL AUTHORITY AND ARGUMENT

18 U.S.C. § 3145(b) states:

> If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly.

The review by this court is *de novo*.

There are four factors under Section 3142(g) that the Court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense

charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.  18 U.S.C. § 3142(g).  A review of these factors shows that detention is appropriate.

The government respectfully submits that there is no condition or combination of conditions that would assure the safety of the community or of the defendant's appearance at future proceedings.  Since the defendant has been on pre-trial release in his D.C. Superior Court case, four firearms have been seized from his apartment on two occasions. Further, the defendant has a demonstrated history of non-compliance with pre-trial release, including the tampering of evidence and obstruction of justice.

The recent incidents in jail do not affect the Section 3142(g) factors.  The government, and the DOC, have also taken steps to ensure the defendant's safety, which are outlined below.

## I.      Nature and Circumstances of the Offenses Charged

The nature and circumstances of the offenses charged weigh in favor of detention.  As described above, law enforcement searched the defendant's apartment twice, nearly one year apart. During each search, law enforcement seized firearms, ammunition, illegal narcotics, and other drug paraphernalia

During the September 2021 search, for example, officers recovered a Glock 43, a Ruger SR45, and a Glock 17, as well as a white rock-like substances consistent with the appearance of crack cocaine, from the defendant's apartment.  Results from DNA testing on the Glock 43 are consistent with the defendant being a DNA contributor to that gun.  While the results for DNA testing on the other two firearms are inconsistent with his DNA being on them, it is still troubling

that it appears that the defendant is allowing his apartment to be used for storing firearms or permitting those with firearms access to his apartment.   Officers also recovered a large amount of U.S. currency (including from a shoebox that the defendant himself told officers about), two digital scales (including one from the defendant's pocket), crack cocaine (including some from the same aforementioned shoebox), and approximately 15 ounces of marijuana.

During the September 2022 search, agents again recovered firearms and drugs despite the defendant's attempts to prevent their discovery and seizure.   Specifically, agents recovered a loaded Glock 19 firearm, fentanyl, substances that appear to be cocaine and cocaine base, ammunition, and three firearm magazines, including one fully loaded 33-round extended magazine.   There is no dispute that the defendant was the sole occupant.

Not only was the defendant on release from his D.C. Superior Court case at the time of this most recent search, but the defendant was also aware that he was under investigation by the government at the time agents executed the arrest warrant in this case.   Specifically, after his attorney reached out to the government about possible additional charges, the government and defense engaged in pre-indictment plea discussions to resolve his Superior Court matter and the September 2021 search.   The defendant was aware that he was under investigation, that plea negotiations had broken down, and that an indictment was forthcoming.   In other words, even though it became apparent to the defendant that he was about to be federally indicted, he continued to keep illegal guns and drugs in his apartment in blatant defiance of the law and his Superior Court release conditions.   Based on the nature and circumstances of the offense and his repeated flouting of release conditions, there is no release condition, or combination of conditions, that can assure the safety of the community.

## II.        Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also clearly weighs in favor of detention.   The evidence against the defendant is strong.   As detailed above, the illicit items were found in the defendant apartment, the defendant directed officers to some of the contraband, and DNA results strongly link the defendant to one of the firearms recovered.

Absent a plea, the government also intends to supersede the current indictment with charges related to the contraband recovered from the defendant's apartment on September 1, 2022. Should it do so, the evidence would also be strong.   All the items were either found in the defendant's apartment or directly beneath an open window to his apartment.   Furthermore, the defendant and his mother are the lessees to the apartment, and no other person was in the apartment at the time of his arrest.   The defendant's attempts to tamper with evidence, such as by dropping the gun and drugs out the window, or by flushing suspected drugs down the toilet while in FBI custody, further show his guilt.

## III.        The Defendant's History and Characteristics

The third factor, the history and characteristics of the defendant, also weighs in favor of detention.   This Court considers, among other factors, "the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history."   *United States v. Taylor*, 289 F. Supp. 3d 55, 69 (D.D.C. 2018).   In considering pretrial

detention, the Court "may also consider prior arrests or charges brought against a defendant, even when those actions did not result in convictions."   *See id.* at 70.

While the defendant does not appear to have any prior convictions, as noted in the Pre-Trial Services Report (PSR), he was pending release in D.C. Superior Court case 2021 CF2 003768 when he committed the offense in this case.   Notably, that case also involves the defendant's possession of drugs with intent to distribute while in possession of a firearm.   The D.C. Superior Court charges carry a presumption of detention under local D.C. law.   *See* 23 D.C. Code § 1322(c)(1).   Thus, the defendant effectively has two pending firearm and narcotics charges with rebuttable presumptions in favor of detention.

The fact that agents recovered more drugs and a firearm when executing the arrest warrant for this case gives rise to additional gun and drug charges.   Additionally, the defendant has an earlier no-papered robbery arrest where, irrespective of the reasons for the no-paper, the defendant had on his person an illegal firearm.   The defendant has proven himself untrustworthy time and time again.   Further, the defendant appears to have no stable legal employment; his day-to-day activities appear to revolve around his engagement in drug trafficking; and he has brazenly ignored the pre-trial release condition that he not possess any firearms.

While the defendant's parents live nearby and it appears that he has a supportive family, his first two arrests occurred *while he was living with his parents and under their supervision.* Thus, the defendant has already demonstrated that his parents' supervision is insufficient to prevent criminal activity.   Further, the defendant himself has stated considerable opposition to being released under the custodianship of his parents, either in D.C. or in Georgia.   In recorded jail calls, the defendant can be heard blaming his father's statements to Magistrate Judge Harvey

as the reason he was detained.   For context, the defendant's father stated at the detention hearing that his son, the defendant, was hanging out with the wrong people and blamed some of his son's actions on some mental health issues.   However, the defendant, in various jail calls, stated that his father's statements were "wild ass shit," and that "he [the father] fucked it up."   The defendant can also be heard mocking his father's explanation that he was hanging out with the wrong people, indicating that the defendant is not seriously committed to taking steps to stay out of trouble. Finally, in one call, the defendant states that he would not stay in Georgia until trial.   In short, the defendant's own statements bely the defense's proffered reasons for why release is appropriate.

All these facts and characteristics unique to this defendant underscore that he poses a pronounced risk of non-compliance should he be released.

## IV.    Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, also weighs in favor of detention.   As noted above, based on the charges in the indictment, there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" where a judicial officer determines that there is probable cause to believe that the person committed the charged offense.   18 U.S.C. § 3142 (e)(3)(A).   Under the Bail Reform Act, 18 U.S.C. §§ 3142 *et seq.*, "[t]he statutory language, as well as the legislative history, unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community."   *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985).   The legislative history also "fully supports the conclusion that Congress intended to equate drug trafficking with danger

to the community." *Strong*, 775 F.2d at 507.   The legislative history indicates that the rebuttable

presumption covering serious drug trafficking offenses was included because:

> Persons charged with major drug felonies are often in the business of importing or
> distributing dangerous drugs, and thus, because of the nature of the criminal activity
> with which they are charged, they pose a significant risk of pretrial recidivism.
> Furthermore, the Committee received testimony that flight to avoid prosecution is
> particularly high among persons charged with major drug offenses.   Because of
> the extremely lucrative nature of drug trafficking, and the fact that drug traffickers
> often have established substantial ties outside the United States from whence most
> dangerous drugs are imported into the country, these persons have both the
> resources and the foreign contacts to escape to other countries with relative ease in
> order to avoid prosecution for offenses punishable by lengthy prison sentences.

*United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (quoting S. Rep. No. 225, 98th

Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203).   Thus, in creating a

presumption of pretrial detention for serious drug trafficking offenses, both the legislative history

and the statutory language make clear that real-world concerns lie behind the recognition of the

inherent pretrial dangers and flight risks posed by those who commit serious drug trafficking

offenses.

The presumption is rebuttable and does not shift the ultimate burden of proof from the

government's shoulders.   But it does create a burden of production on the defense to submit at

least some credible evidence that might purport to overcome it.   And even if the defense does

submit such evidence, the presumption remains as a factor that may be considered by the Court

among others in determining whether the defendant should be detained, and the presumption

retains "evidentiary weight."   *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When

a defendant produces such evidence, however, the presumption does not disappear.   The burden

of persuasion remains on the government and the rebutted presumption retains evidentiary

weight") (citations omitted); *United States v. Rueben*, 974 F.2d. 580, 586 (5th Cir. 1992) ("[T]he

mere production of evidence [regarding flight risk for a drug offense] does not completely rebut the presumption . . . . In making its ultimate determination, the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society.") (citation omitted); *United States v. Rodriguez*, 950 F.2d 85, 88 (2nd Cir. 1991) ("Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption . . . . Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant.); *see also United States v. Jessup*, 757 F.2d 378, 382–83 (1st Cir.1985) (rejecting "bursting bubble" approach) (internal citation omitted); *United States v. Ali*, 793 F.Supp.2d 386, 388 and 388 n.2 (D.D.C. 2011) ("Even if such contrary evidence or credible proffers are offered, the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained.").

The firearms and narcotics seized during the searches of the defendant's apartment raise grave safety concerns for the community.   Moreover, the defendant's conduct over more than a year has shown a clear history of unlawful firearms possession, narcotics possession and trafficking, and failures to comply with pre-trial release conditions.

The defendant's attempts to prevent agents from seizing contraband by dropping a loaded weapon and drugs from his apartment window into a public alleyway in close proximity to an elementary school, and by flushing drugs down an FBI toilet is not only reckless, it is obstructive. "A threat of future dangerousness may be based on the risk that no conditions 'will reasonably prevent the defendant from obstructing justice.'"   *United States v. DeGrave*, 539 F. Supp. 3d 184,

199 (D.D.C. 2021).   In *DeGrave*, the court agreed "with the government that there is a serious risk that [defendant] will obstruct or attempt to obstruct justice if he is released on bond," because the defendant "deleted his own social media messages related to the Capitol insurrection," and "asked others . . . to delete and 'untag' their posts involving him."   *Id*. at 208.   Here, the "risk of [the defendant] engaging in future obstructive behavior is 'identified and articulable,'" *id*., due to the obstructive actions he already took and the risk that he would engage in further obstructive acts should he be released.   *See United States v. Chrestman*, 525 F. Supp. 3d 14, 34–35 (D.D.C. 2021) ("[the] missing items gives rise to the inference that defendant may have tried to conceal or discard evidence while trying to stay a step ahead of the investigation against him, and may, if released, take further steps to impede the investigation. . . . In short, the fact that defendant did not flee or evade arrest does little to mitigate the heavy weight of the other factors favoring detention, given the clear danger he poses to the community and the fact that he engaged in conduct after January 6, 2021 that may have resulted in missing or obstructed evidence.")

## V.     Incidents at the Jail Do Not Alter This Analysis

While defense argues that recent incidents at the jail support the defendant's release, additional information received by the government shows that the defendant will continue to pose a danger if he were to be released.

The defendant appears to have been assaulted by several other inmates in CDF on September 30, 2022.   The incident is still under investigation by the DOC, but the preliminary information conveyed to the government is that that the defendant was involved in a physical altercation that happened within and immediately outside of his cell.   The defendant was uncooperative with DOC's investigation, and it is unclear at this time what led to the altercation.

DOC has instituted separation orders for the defendant against all the inmates involved in the altercation.

On October 9, 2022, counsel for the defendant informed the government that the defendant was assaulted again, apparently on October 7, and had sustained injuries.   Prior to defense's email, the government was unaware of this second incident (although it did receive an alert on October 8 that he was taken to Howard hospital).   After receiving defense's email, the government immediately contacted DOC to understand the situation, but given the weekend and holiday, it was unable to reach any investigator with the DOC.   The government, at this point in time, does not have additional information related to the circumstances of this assault.

However, on October 9, the government was able to reach a Captain at DOC.   The Captain informed the government that the defendant was placed in protective custody in CDF after the most recent incident.   The Captain stated that protective custody means that the defendant has a cell to himself, and that every time he leaves his cell he must have an officer escort.   Additionally, on October 9, the government submitted an emergency request to transfer the defendant to the Special Management Unit ("SMU") of CTF to further ensure the defendant's safety.   The next day, October 10, an employee at the U.S. Attorney's Office stated that she would see on October 11, if SMU was still an option.   However, at about 11:40am on October 10, a deputy warden at CDF indicated the defendant was already in CTF SMU.

The government submits that these recent incidents do not materially affect any of the Section 3142(g) factors.   *Cf. United States v. Otunyo*, No. CR 18-251 (BAH), 2020 WL 2065041, at *8 (D.D.C. Apr. 28, 2020) ("As a general matter, the current COVID-19 pandemic is a poor fit for the § 3142(g) analysis.").   There is no argument that the possibility of assaults occurring within

jail affects the first two Section 3142(g) factors.   While the third factor concerns "the person's character, physical and mental condition," and the fourth factor concerns "the nature and seriousness of the danger" posed by the defendant's release, the defense has not articulated any specific reason the recent incidents favor release under these two factors.

*United States v. Thomas*, 456 F. Supp. 3d 69, 76 (D.D.C. 2020), cited by the defense for the proposition that "the defendant's health and safety in jail 'alters the dangerousness calculus by making it significantly more likely that [the defendant] will obey the conditions of his release and thus not pose a danger to the community,'" is inapposite.   In that case, the court held that the defendant's demonstrated and proven diagnosis of Stage II sarcoidosis, a serious lung disease, rendered the defendant at substantial risk from suffering from life-threatening complications from COVID-19.   As a result, this "particular" vulnerability, and the inability of the government to ameliorate this risk, tilted these factors ever so slightly in favor of defendant's release.

In this case, however, unlike an immutable characteristic such as a disease diagnosis, there is no information indicating that the defendant is significantly more likely to suffer from assaults in jail.   Even more importantly, the government and DOC have taken steps to ensure that the defendant is not assaulted again such that the risk of any future assault may even be lower than that for the average inmate.   The logic underlying *Thomas*, that a defendant has extra-incentive to obey release conditions when they face a substantially increased risk of death should they violate release conditions and be returned to the jail, is not applicable in this case.

On the other hand, the government has grave concerns regarding potential actions the defendant might take to obstruct justice should he be released.   The government has new information in this regard that was not available at the time of the detention hearing before

Magistrate Judge Harvey.   Specifically, in a recorded jail call the defendant made on September 10, 2022, he can be heard talking about how he has $5,000 stashed at his parents' house. Specifically, he states, "I got like a cool 5 in my mother's house, but I got some other shit tucked somewhere else."   Later on, he says again "I got some other little shit tucked away somewhere."

As mentioned above, the government is not aware that the defendant has lawful employment, and his day-to-day activities appear to revolve drug trafficking.   As a result, the government believes the "cool 5" the defendant has stashed at his parents' house are proceeds from illegal drug transactions, that is, potential evidence.   Its investigation into this contraband is ongoing.   Therefore, should the defendant be released to the custody of his parents and reside at his parents' house, the defendant could easily secrete these funds, and any other evidence located there, and thereby obstruct justice.   Moreover, as evident by the defendant's other statements, he has other items stashed elsewhere, which are likely illegal contraband.   His release would facilitate any attempt to recover or destroy these items.

In *DeGrave*, the court noted that two witnesses "left certain unspecified 'items' with these individuals and may have discussed the events at the Capitol," and as a result, "[t]he government expresse[d] concern that Mr. DeGrave may try to contact these witnesses and influence any prospective testimony they might provide."   539 F. Supp. 3d at 208.   The court agreed, noting, similar to Mr. Carr's conduct in this case, that the defendant had already engaged in prior obstructive acts such as deleting messages.   The court further held that it "is not satisfied that restrictive release conditions could assure the integrity of this judicial proceeding.   Even if Mr. DeGrave's computer and phone were effectively monitored by Pretrial Services, he could interfere with witnesses, particularly those in the Las Vegas area, through verbal communications."   *Id*.

Similarly, if the defendant were to be released, there would be no effective means to monitor his communications, either electronic or verbal, and he could easily, through his actions or through his communications with a third-party, dispose of the "other little shit tucked away somewhere."

The government submits that these recent developments have, if anything, tilted the balance even more in favor of the defendant's detention.   Any *potential* risk to his personal safety can be addressed.   The *proven* risk of his repeated obstructive actions, and demonstrated noncompliance with conditions of release, cannot be addressed if he were to be released.   The defendant's continued detention is warranted.

## **<u>CONCLUSION</u>**

The government respectfully requests that the Court deny the defendant's motion for release.

Respectfully submitted,

MATTHEW GRAVES,
UNITED STATES ATTORNEY


By:      /s/ *Andy Wang*
Andy T. Wang
D.C. Bar No. 1034325
Solomon S. Eppel
D.C. Bar No. 1046323
Assistant United States Attorneys
United States Attorney's Office for D.C.
601 D Street, N.W.,
Washington, D.C. 20530
andy.wang@usdoj.gov
(202) 870-4940
solomon.eppel@usdoj.gov
(202) 252-6661